# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELMARSH, LLC, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellant, | § | No. 248, 2021 |
| | § | |
| v. | § | |
| | § | Court Below: Superior Court |
| ENVIRONMENTAL APPEALS | § | of the State of Delaware |
| BOARD OF THE STATE OF | § | |
| DELAWARE and DELAWARE | § | C.A. No. S20A-11-002 |
| DEPARTMENT OF NATURAL | § | |
| RESOURCES AND | § | |
| ENVIRONMENTAL CONTROL, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees. | § | |

Submitted: April 18, 2022
Decided: May 10, 2022

Before **SEITZ**, Chief Justice; **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

Richard L. Abbott, Esquire, Abbott Law Firm, Hockessin, Delaware, *for Plaintiff Below, Appellant Delmarsh, LLC.*

Kayli H. Spialter, Esquire, Delaware Department of Justice, New Castle, Delaware, *for Defendants Below, Appellees Environmental Appeals Board of the State of Delaware and Delaware Department of Natural Resources and Environmental Control.*

**SEITZ**, Chief Justice:

The St. Jones and Murderkill Rivers empty into the Delaware Bay about a half a mile apart. The Town of Bowers lies between the mouths of these rivers, and is named for John Bowers, who owned the land in the early 1700s.[1] Delmarsh, LLC, a Delaware real-estate company, owns six lots in Bowers. The lots have long been designated as wetlands on the State Wetlands Map. The Department of Natural Resources and Environmental Control ("DNREC") removed a portion of the lots from the Wetlands Map in 2013 at Delmarsh's request. In June 2019, Delmarsh requested that DNREC designate the remaining portion of the lots as non-wetlands. DNREC denied the request, and Delmarsh appealed to the Environmental Appeals Board ("the Board"). The Board affirmed DNREC's denial. Delmarsh appealed to the Superior Court, which affirmed the Board's decision. We now affirm the Superior Court's judgment.

I.

Del-Homes, Inc. acquired the lots in 1989. At the time, they were designated as wetlands on the State Wetlands Map.[2] The lots held that designation when Del-Homes, Inc. eventually transferred them to Delmarsh and its sole owner, Jeffrey

---

[1] Delaware Public Archives, Bowers (2019), available at https://archives.delaware.gov/town-and-city-histories/town-of-bowers/.
[2] App. to Opening Br. at A-023.

Liberto.[3]  At  Liberto's request, DNREC amended the State Wetlands Map in 2013 and designated a portion of the lots as non-wetlands or "uplands."[4]  In June 2019, Delmarsh requested that DNREC remove the remainder of the lots from the Wetlands Map.  DNREC rejected Delmarsh's application, and Delmarsh appealed the rejection to the Board and then to the Superior Court.  For ease of discussion, we will summarize the Board and Superior Court appeals by the issues Delmarsh raised in the appeals.

A.

During the Board hearing to review DNREC's decision, Delmarsh submitted a Motion *in Limine* to exclude from evidence a 1926 aerial photograph offered by DNREC.  The photograph depicts "a clear channel coming from the St. Jones River" to a tidal ditch alongside the property, connecting the lots to tidal waters.[5]  Delmarsh argued that the photograph could not be authenticated under Delaware Rule of Evidence ("D.R.E.") 901; the photograph was irrelevant under D.R.E. 403 because DNREC used "lay witnesses" rather than experts to interpret the photograph; the photograph was inadmissible as expert evidence under D.R.E. 701 and 702; and the

---

[3] *Id.* at A-147–52; App. to Answering Br. at B-068–69.
[4] App. to Opening Br. at A-197–98.
[5] *Id.* at A-011–15 (Appellant's Motion *in Limine*).  The photograph is at App. to Opening Br. at A-028–29.

Site Summary and DNREC's Decision were inadmissible because they relied on the photograph.

DNREC responded that the photograph was self-authenticating under D.R.E. 902(5) as part of a government website; Delmarsh failed to demonstrate any prejudice that outweighed the photograph's probative value under D.R.E. 403; the contents of the photograph were not hearsay under D.R.E. 803(16); DNREC's witnesses were experts, but regardless could testify as lay witnesses under D.R.E. 701 about how they had used the photograph in their decision-making process; and the Site Summary and DNREC Decision were admissible because their relevancy and reliability did not depend on the photograph. After a private conference to consider the objection, the Board unanimously denied the Motion *in Limine* without comment.

In its appeal to the Superior Court, Delmarsh argued that the Board erred by not providing a rationale for denying the Motion, supposedly leaving the Superior Court unable to exercise review. The Superior Court viewed the admissibility of the photograph as an evidentiary issue and reviewed whether there was "substantial evidence" to support the Board's decision to admit the photograph.[6] It ruled that the Board had "reasonably accepted DNREC's arguments for admitting the

---

[6] Exhibit to Opening Br. at *6 (*Delmarsh, LLC v. Envtl. Appeals Bd., et al.*, No. S20A-11-002, at *6 (Del. Super. Jul. 8, 2021) (hereinafter, "Op.") (citing *Delaware Solid Waste Auth. v. Delaware Dep't of Nat. Res. & Envtl. Control*, 250 A.3d 94, 119–20 (Del. 2021))).

Photograph . . . and there exists substantial evidence in the record for that decision."[7] Because the Board did not violate any procedural requirements, the Superior Court found the photograph was admitted properly.[8]

B.

Delmarsh also argued before the Board that the lots did not meet the statutory definition of wetlands, which includes "lands . . . 'subject to tidal action' or 'areas which are now or in this century have been connected to tidal waters' . . . ."[9] Delmarsh contended that this definition—and specifically the inclusion of the phrases "subject to tidal action" and "connected to tidal waters" —contemplates the "regular ebb and flow" of a daily tide, such as a beach shoreline.[10]

DNREC's employee Tyler Brown testified at the hearing that the agency interpreted "connected to tidal waters" to include "[a]ny [geological] form or feature that's directly connecting to a [water] feature . . . in this case, . . . a ditch-like feature running from the St. Jones River adjacent to [the lots.]"[11]   Geological features

---

[7] *Id.*

[8] *Id.* at *7.

[9] *Decision & Order of the Envtl. Appeals Bd.*, Appeal No. 2020-03 at 2 (Nov. 5, 2020) (hereinafter "Board Op.") (citing 7 *Del. C.* § 6603(h)).

[10] App. to Answering Br. at B-131–34; B-136–37; B-187–89 (Transcript of Board Hearing Aug. 11, 2020).

[11] *Id.* at B-170. *See also id.* at B-172 ("[T]idal wetlands, just because they're tidal wetlands does not mean they get the daily ebb and flow every day. . . .  There's thousands of acres of tidal wetlands that only get . . . tidal waters on them during above average high tides or storm events."). Brown had personally surveyed the lots and was part of the decision to deny Delmarsh's application.  Board Op. at 10–11; App. to Opening Br. at A-204–05.

considered in a wetlands analysis, Brown testified, might be natural or manmade, and when natural, "their function ecologically is to feed tidal water into the marshes[.]"[12] The ditch, he testified, would "cause tidal action" on the lots.[13] Brown also explained that tidal wetlands may or may not have "regular ebb and flow" and that whether land was "connected to tidal action" could be determined based on elevation and frequency of flooding.[14] He gave as an example locations that flood during "several high tide events a year[.]"[15] This was the case with the lots.[16]

The Board concluded "as a matter of law" that the lots were wetlands under the Wetlands Act and cited as evidence the photograph, a 1950 subdivision plan that showed the same ditch,[17] and Delmarsh's topographical survey, which showed that "the majority of the [lots] are within 2 feet of the mean high tide line."[18] The Board also found Brown to be a credible and reasonable witness.

---

[12] App. to Answering Br. at B-160–61.

[13] *Id.* at B-173–74.

[14] *Id.* at B-175. While the statute says "subject to tidal action," counsel for DNREC asked Brown whether this met the definition of "connected to tidal action." *Id.* at B-176.

[15] *Id.* at B-175–76.

[16] *Id.* at B-194–95 ("Q: And would you agree that there's been no tidal connection with the six lots in the 21st Century? A: The fact that the information of the elevation I would assume that water overtops Flack Avenue several times as [*sic*] year. Yes, I would say there is tidal influence. Q: What several times a year? A: Storm events, certain storm events. Spring high tides. . . . In fact, I've observed the site with water on it and tons of stranded horseshoe crabs."). He additionally testified that the lots had been flooded when he had visited, and that the agency had received reports Liberto was "actively pumping water off" the lots. *Id.* at B-197–98.

[17] App. to Opening Brief at A-200–01. The 1950 Subdivision Plan shows property owned by Charles and Margaret Shore, prior owners of the land that included the lots. *Id.* The lots are identified on this map as Lots 22 through 25, Lot 32, and Parcel D.

[18] Board Op. at 10.

Before the Superior Court, Delmarsh argued again that the lots were not "subject to tidal action" or "areas which are now or in this century have been connected to tidal waters."[19]  The Superior Court affirmed the Board's decision, affording due weight to the Secretary's determination.[20]  The court found the Board properly interpreted the meaning of "wetlands" under the Wetlands Act, an interpretation "construed in accordance with the statute's purpose."[21]

C.

Delmarsh also argued that the Board applied an incorrect legal standard to review DNREC's final decision.  The decision included issues of fact and of law, with a different standard of review for each.[22]  With respect to the interpretation of the statutory term "wetlands," the Board gave substantial weight to how DNREC interpreted the statutory definition of wetlands and stated that it would only reverse if DNREC's interpretation was "clearly wrong."[23]  The Board held "DNREC's determination is not unreasonable or clearly wrong."[24]  With respect to the factual issues, the Board placed the burden on Delmarsh to show the decision was "not

---

[19] Op. at *13.
[20] Id. at *13–14.
[21] Id. at *14.
[22] The Superior Court analyzed the standards of review applied by the Board, and then reviewed the statutory interpretation question and "substantial evidence" questions together.  We present them in a slightly different order, to better reveal the various issues.
[23] Board Op. at 2; see also id. at 10 (quoting Div. of Soc. Servs. v. Burns, 438 A.2d 1227, 1229 (Del. 1981)).
[24] Id. at 10.

7

supported by the evidence on the record before the Board[,]"[25] taking "due account of the experience and specialized competence of the agency" and the statute at issue.[26] It ruled that Delmarsh had not carried that burden and that Brown's testimony was convincing and supported by the evidence.[27]

On appeal to the Superior Court, Delmarsh contended that deference to DNREC's interpretation of wetlands was improper because Delmarsh was appealing a decision, not a regulation.[28] It argued that the Board erred in applying "substantial weight" and "clearly wrong" standards, because the relevant precedent dealt with personnel rules rather than statutory provisions.[29] Delmarsh also claimed that the "due weight" standard applies only when a court reviews an agency's statutory interpretation, not an administrative appellate body like the Board, and therefore the Board should have interpreted "wetlands" independent of DNREC's interpretation.[30]

The Superior Court disagreed. It explained that, while plenary review applied, due weight may be afforded an agency's interpretation of the statutes it administers, and the weight may be substantial given the statute, particular case, and relevant

---

[25] *Id*. (quoting 7 *Del. C.* § 6008). The Board did not cite directly to the Delaware Code, but this is the origin of the language it used.
[26] *Id.* (quoting 29 *Del. C.* § 10142).
[27] *Id.* at 10–11.
[28] Op. at *8.
[29] *Id.* (citing *Pub. Water Supply Co. v. DiPasquale*, 735 A.2d 378, 381 (Del. 1999)).
[30] *Id.* at *8–9.

facts.[31]  The Superior Court found that the Board correctly "afforded substantial weight" to the Secretary's decision based on the expansive statutory language in the Wetlands Act and the Secretary's expertise.[32]

Delmarsh also contested the Board's factual determinations and whether there was substantial evidence to support the Secretary's and the Board's final decisions.[33] The Superior Court explained that Delmarsh had the burden of proof "to show that the Secretary's decision is not supported by the evidence on the record before the Board."[34]  It held that, although the Board mentioned the "clearly wrong" standard, it ultimately found that Delmarsh "failed to carry its burden of demonstrating that the Secretary's decision is not supported by the evidence" before the Board, the correct standard.[35]  And the Superior Court's review of the record found that the decision was supported by substantial evidence.[36]

## D.

Delmarsh's final argument centered on a takings claim under the Fifth Amendment to the United States Constitution.  Before the appeal reached the

---

[31] *Id.*; *id.* at \*10 (citing *DiPasquale*, 735 A.2d at 382); *id.* at \*10 n.31 and accompanying text (collecting cases where Delaware courts have afforded various amounts of weight to agency decisions).

[32] *Id.* at \*11–12.  The Wetlands Act specifically provides that the chapter "shall be liberally construed in order to preserve the wetlands of the State" as "necessary for the welfare of the State and its inhabitants."  7 *Del. C.* § 6619.

[33] Op. at \*13.

[34] *Id.* at \*9 (quoting *Delaware Solid Waste Auth.*, 250 A.3d at 115).

[35] *Id.* at \*12.

[36] *Id.* at \*15.

Superior Court, Delmarsh applied for, and the Town of Bowers approved, the re-zoning of the lots from Conservation/Agricultural to Residential.[37] Delmarsh then argued that the wetlands designation deprived the lots of any economically viable use under the residential zoning classification.[38]

The Superior Court ruled that the regulation of the lots as wetlands did not result in a taking because Delmarsh "ha[d] not been denied all reasonable use of its property[,]" just the ability to build residential properties.[39] It also held that there was no "taking 'where there is a complete absence of any change in the [use] or value of the property.'"[40] Finally, the Superior Court held that because Delmarsh was appealing an application denial, not a new regulation of the lots, there was no "change in the use of the property" that would create a taking.[41]

Delmarsh timely appealed the Superior Court's decision.

## II.

When an administrative decision is on appeal from the Superior Court, "this Court examines the agency's decision directly."[42] Our review of the Environmental

---

[37] Opening Br. at 14; App. to Opening Br. at A-214–16.

[38] Opening Br. for Appellant, *Delmarsh, LLC v. Environmental Appeals Bd. of the State of Delaware*, at 30 (Del. Super. Jul. 8, 2021) (C.A. No. S20A-11-002).

[39] Op. at *15–16.

[40] *Id.* (first quoting *Kern Co., Inc. v. Town of Dewey Beach,* 1994 WL 89333, at *7 (Del. Super. Feb. 18, 1994); then citing *Goldberg v. City of Rehoboth Beach*, 565 A.2d 936, 944–45 (Del. Super. 1989)).

[41] *Id.* at *16.

[42] *Delaware Solid Waste Auth.*, 250 A.3d at 105 (citing *United Parcel Serv. v. Tibbits*, 93 A.3d 655, 2014 WL 2711302, at *2 (Del. June 12, 2014) (TABLE)).

Appeals Board's decision is limited to "whether the decision is supported by substantial evidence and is free from legal error."[43] Absent any abuse of discretion, "the decision of the agency must be affirmed."[44] And while "[s]tatutory interpretation is ultimately the responsibility of the courts[, a] reviewing court may accord due weight, but not defer, to an agency interpretation of a statute administered by it."[45] Finally, when considering constitutional issues decided by the Superior Court, "we apply a *de novo* standard of review."[46]

A.

Delmarsh argues that the Board's failure to explain its denial of the Motion *in Limine* was legal error because there is no record for this Court to review. DNREC responds that "evidentiary rulings are within the sound discretion of the administrative tribunal and will not be reversed absent a clear abuse of discretion."[47] DNREC also contends that even if the lack of reasoning was an abuse of discretion, the decision should not be overturned because any error was harmless. Finally,

---

[43] *Id.* (first quoting *Keep Our Wells Clean v. Del. Dep't Nat. Res. & Envtl. Control*, 243 A.3d 441, 445–46 (Del. 2020); then citing *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1244 (Del. 1985)). "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* at 105–06 (quoting *Keep Our Wells Clean*, 243 A.3d at 446).

[44] *DiPasquale*, 735 A.2d at 381 (quoting *Stoltz Mgmt. Co., Inc. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992)) (internal footnote omitted).

[45] *Id.* at 382.

[46] *Ploof v. State*, 75 A.3d 840, 851 (Del. 2013) (citing *Swan v. State*, 28 A.3d 362, 382 (Del. 2011), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016)).

[47] Answering Br. at 16 (quoting *Finney v. Delaware Dep't of Transp.*, 2021 WL 321072, at *4 (Del. Super. Feb. 1, 2021)).

DNREC argues that if this Court finds that the Board abused its discretion by failing to articulate its reasoning for denying the Motion, then we should review the evidentiary record *de novo*.

In an administrative proceeding, evidentiary rulings are "within the sound discretion of the administrative tribunal and will not be reversed absent a clear abuse of discretion."[48] "[T]he Rules of Evidence do not strictly apply to administrative hearings. Rather, the agency may hear 'all evidence which could conceivably throw light on the controversy.'"[49] The rules of evidence are relaxed "because the Board is the finder of fact, not a jury."[50]

The Superior Court applied an incorrect standard of review—whether substantial evidence supported admission of the photograph—but applying the correct standard leads to the same result. The Board had to assess, under relaxed evidentiary rules, whether the photograph had "probative value commonly accepted

---

[48] *Baynard v. Kent County Motors, Inc.*, 548 A.2d 778, 1988 WL 101220, at *1 (Del. 1988) (TABLE). "An abuse of discretion occurs when a court has exceeded the bounds of reason in view of the circumstances or so ignored recognized rules of law or practice to produce injustice." *Harper v. State*, 970 A.2d 199, 201 (Del. 2009) (quoting *Culp v. State*, 766 A.2d 486, 489 (Del. 2001)).

[49] *Tenaglia-Evans v. St. Francis Hosp.*, 913 A.2d 570, 2006 WL3590385 at *3 (Del. 2006) (TABLE) (quoting *Ridings v. Unemployment Ins. Appeal Bd.*, 407 A.2d 238, 240 (Del. Super. 1995)).

[50] *Hellstern v. Culinary Servs. Grp.*, 2019 WL 460309, at *12 (Del. Super. Jan. 31, 2019); *see also* 7 *Del. Admin. C.* § 105-5.4 ("Strict rules of evidence shall not apply. All evidence having probative value commonly accepted by a reasonably prudent person in the conduct of his or her affairs shall be admitted.").

by a reasonably prudent person in the conduct of his or her affairs[.]"[51] We find this to be the case.

The photograph was relevant. It served as evidence of a ditch that connected the property to tidal waters, adding "probative value" to the Board's analysis. Also, Brown's explanation of the photograph was deemed credible by the Board and became an important source of evidence.[52] Brown was the program manager of the Wetlands and Subaqueous Lands Section of DNREC with approximately ten years of experience in the environmental field and more than seven years of experience in the wetlands and subaqueous land section.[53] In his role at DNREC, he reviewed aerial photography.[54] And even if Brown was not an expert, he could testify about his specific experience with and use of the photograph to make DNREC's decision. Under the relaxed rules of evidence, the Board did not err by considering the photograph or other documents that relied on the photograph.

B.

Next we address the Board's interpretation of the Wetlands Act. The Board concluded "as a matter of law" that the lots were wetlands,[55] but it relied on the

---

[51] 7 *Del. Admin. C.* § 105-5.4.
[52] *Murphy & Landon, P.A. v. Pernic*, 121 A.3d 1215, 1221 (Del. 2015) ("This Court does not weigh the evidence, determine questions [of] credibility, or make its own factual findings." (citing *Thompson v. Christiana Care Health Sys.*, 25 A.3d 778, 782 (Del. 2011))).
[53] App. to Answering Br. at B-156.
[54] *Id.* at B-146–47; B-154; B-156; B-157.
[55] Board Op. at 10.

factual record to do so, making the issue a mixed question of law and fact. In this situation, the findings are reviewed for clear error.[56] To the extent that DNREC interpreted a statute, the Court "may accord due weight, but not defer," to the agency's interpretation of the statute which it regularly administers.[57] And in interpreting "a statute[,] the fundamental rule is to ascertain and give effect to the intent of the legislature."[58]

Here, 7 *Del. C.* § 6619 provides that "[t]his chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed in order to preserve the wetlands of the State."[59] In relevant part, it states:

> "Wetlands" shall mean those lands above the mean low water elevation including any bank, marsh, swamp, meadow, flat or other low land subject to tidal action in the State along the Delaware Bay and Delaware River, Indian River Bay, Rehoboth Bay, Little and Big Assawoman Bays, the coastal inland waterways, or along any inlet, estuary or tributary waterway or any portion thereof, including those areas which are now or in this century have been connected to tidal waters . . . .[60]

The Board found that a wetland must meet three criteria: (1) "the lands must be situated between mean low water and high water elevations;" (2) "the lands must be 'subject to tidal action' or 'areas which are now or in this century have been

---

[56] *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985) (in a mixed question of law and fact, "the proper standard of review requires this Court to reverse the findings of the lower court only if the findings below are 'clearly wrong and the doing of justice requires their overturn.'" (quoting *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972))).
[57] *DiPasquale*, 735 A.2d at 382.
[58] *Coastal Barge Corp.*, 492 A.2d at 1246 (citing 73 Am. Jur. 2d *Statutes* § 146 (1974)).
[59] 7 *Del. C.* § 6619.
[60] 7 *Del. C.* § 6603(h).

connected to tidal waters;'" and (3) they must be "lands upon which may grow, or which are capable of growing, certain plant types."[61] The Board did not independently interpret "tidal action" or "tidal waters" but based its decision in part on the connection with the "tidal ditch that flows along or near or adjacent to the lots at issue."[62]

Delmarsh argues for a limited interpretation of the Wetlands Act—that the lots "must actually be subject to tidal flow (the twice per day ebbs and flows of the ocean and directly connected waters) to qualify as Wetlands."[63] Delmarsh also claims that the lots are not "connected" to the tidal ditch and that mere proximity to a tidal ditch does not qualify as a tidal connection.[64] DNREC, in reply, points out that wetlands are not required to have "daily" tidal waters, but can include floods and high water events.[65] DNREC also points to Liberto's testimony that he had seen standing water on the lots and witnessed water from "the bay" breach the dunes and flood the area—demonstrating that the lots were subject to tidal flooding.[66]

Delmarsh's interpretation of the statute is inconsistent with the General Assembly's directive to interpret the statute liberally to accomplish its purposes.[67]

---

[61] Board Op. at 2 (citing 7 *Del. C.* § 6603(h)).
[62] *Id.* at 10.
[63] Opening Br. at 27; Reply Br. at 16.
[64] Opening Br. at 26–27.
[65] Answering Br. at 26 (describing wetlands within Delaware and elsewhere without "daily" tides).
[66] *Id.* at 11; App. to Answering Br. at B-089.
[67] "This chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed in order to preserve the wetlands of the State." 7 *Del. C.* § 6619.

Under Delmarsh's interpretation, thousands of acres of tidal wetlands would no longer qualify as wetlands.[68] Had that been the legislature's intent, it would not have "includ[ed] any bank, marsh, swamp, meadow, flat or other low land subject to tidal action" in the statutory definition—lands which are not necessarily subject to daily tidal flow.[69]

And "connected" means a link between the land and tidal waters.[70] Geological features connect land to tidal waters when they direct tidal water to the land.[71] In this case, Brown testified that the ditch was that connection.[72] As Brown explained, "connected" does not mean "zoning lots, divisions, [and] boundaries, artificially created by man[,]"[73] but the actual presence of tidal water, caused in part by elevation. The connection can be seen when tidal events, like storms and spring tides, flood wetlands with tidal waters.[74] The ecological connection involves consideration of several factors, such as elevation, the likelihood of flooding, soil types "formed under conditions of saturation, flooding, or ponding," and vegetation

---

[68] App. to Answering Br. at B-172 ("There's thousands of acres of tidal wetlands that only get . . . tidal waters on them during above average high tides or storm events.").

[69] 7 *Del. C.* § 6603(h).

[70] App. to Opening Br. at A-205 ("with the St. Jones River being tidal in this area and having a clear tidal connection from the St. Jones River to the sites in question in 1926 . . . [the connection] criterion [is] fulfilled").

[71] App. to Answering Br. at B-160–61 ("Their function ecologically is to feed tidal water into the marshes").

[72] *Id.* at B-217.

[73] *Id.* at B-218.

[74] *Id.*

16

specific to wetland areas.[75]  We agree with DNREC's and the Board's determination

that connection to tidal waters does not require the daily ebb and flow of tides, and

that the lots met the legislative intent for and statutory definition of wetlands.

C.

Delmarsh's next argument is that the Board afforded too much weight to

DNREC's decision.  Delmarsh does not dispute that it had the burden to show that

DNREC's decision was not supported by substantial evidence.  Instead, it focuses

on two legal standards the Board allegedly misapplied.  To quote from the Board:

> When making factual determinations, the Board "shall take due account
> of the experience and specialized competence of the agency and of the
> purposes of the basic law under which the agency has acted."
> Substantial weight is granted to an agency's construction of its own
> rules, such that the agency's construction will only be reversed if it is
> "clearly wrong."  DNREC's determination is not unreasonable or
> clearly wrong.[76]

Delmarsh claims that the Board erred when it deferred to DNREC's factual

determinations, because deference applies only to regulations under 7 *Del. C.*

§ 6008(c).[77]  But Delmarsh misses that § 6008(b) states "[t]he burden of proof is

upon the appellant to show that the Secretary's decision is not supported by the

---

[75] App. to Opening Br. at A-205–06.

[76] Board Op. at 10 (first quoting 29 *Del. C.* § 10141(e); then quoting *Burns*, 438 A.2d at 1229)
(internal citation omitted).

[77] Opening Br. at 21–22 ("Nowhere in § 6008(b) does it provide that any deference is accorded to
DNREC factual determinations of DNREC construction of statutory provisions. . . . By basing the
[Board's] Decision on a legal standard which was inapplicable to the Appeal Application, the
[Board] erred as a matter of law and should be reversed.").

evidence[.]"[78] As we have stated before, this is "a clear instruction that the Board must defer to the Secretary's decision unless the record before the Board—which can include evidence not before the Secretary—does not support that decision."[79]

Delmarsh also argues that the Board's use of "substantial weight" and "clearly wrong" standards of review amounts to legal error. But as the Superior Court explained, the Board mentioned these standards but did not apply them.[80] The Board applied the correct standard on appeal and based its ruling on the grounds that Delmarsh had "failed to carry its burden of demonstrating that the Secretary's decision is not supported by the evidence on the record before the Board."[81]

D.

Delmarsh argues that substantial evidence does not support the Board's decision. Absent an abuse of discretion, however, "the decision of the agency must be affirmed."[82] Evidence from the hearing supported the Board's decision that the lots are properly designated as wetlands:

- The Board found DNREC employee Brown to be a credible witness.[83]

- The photograph and Brown's testimony show a tidal ditch next to the lots.

---

[78] 7 *Del. C.* § 6008(b).

[79] *Delaware Solid Waste Auth.*, 250 A.3d at 115 (citing 7 *Del. C.* § 6008(b)).

[80] Op. at *12 ("the [Board] states 'DNREC's determination is not unreasonable or clearly wrong' seemingly to say that, preliminarily, this higher standard has not been met. The [Board] then immediately follows with the 'correct' standard . . . ." (citing Board Op. at 10)).

[81] Board Op. at 10.

[82] *DiPasquale*, 735 A.2d at 381 (quoting *Stoltz Mgmt. Co., Inc.*, 616 A.2d at 1208).

[83] Board Op at 10–11.

- The 1950 Shore Subdivision Plan shows a ditch in the same location.

- Brown testified that the ditch is a tidal waterway, connecting the lots to the St. Jones River.[84]

- Delmarsh's topographical survey indicates that most of the lots are within two feet of the mean high tide line.[85]

- The lots had been mowed and sprayed with herbicide, but adjacent lots contained *Spartina alterniflora*, and DNREC found stems on the lots resembling the stems and reeds of *Spartina alterniflora*.[86]

- Liberto testified that he had seen standing water on the lots, witnessed water from the bay flood the area during storms, and tried to pump standing water from the lots.[87]

### E.

Finally, we address Delmarsh's takings claim. Under 7 *Del. C.* § 6613:

If the Superior Court finds that the action appealed from constitutes a taking without just compensation, it shall invalidate the order and grant appropriate relief, unless the Secretary at this stage, consents to the reversal or modification of his or her decision. However, the Secretary may, through negotiation or condemnation proceedings under Chapter 61 of Title 10, acquire the fee simple or any lesser interest . . . . If the Secretary has not initiated action to acquire fee simple or any lesser interest in the wetlands in question within 2 years from the date of a final court ruling, the permit must be granted as applied.

---

[84] *Id.* at 9.
[85] *Id.* at 10.
[86] App. to Opening Br. at A-025. "'Wetlands' shall mean those lands above the mean low water elevation . . . upon which may grow or is capable of growing any but not necessarily all of the following plants: . . . Saltmarsh Cordgrass (*Spartina alterniflora*) . . . ." 7 *Del. C.* § 6603(h).
[87] App. to Answering Br. at B-088–89.

The Takings Clause of the Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." The government must pay just compensation when it acquires or intrudes on private property for a public purpose, which in rare circumstances includes regulatory burdens placed on private property by the government.[88] The government regulation must be so onerous that it results in a taking.[89]

There are two avenues of analysis for a regulatory taking claim: first, "with certain qualifications . . . a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause."[90] This is known as a categorical, or "*Lucas,*" claim after the U.S. Supreme Court's decision in *Lucas v. South Carolina Coastal Council*.[91] Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found from "a complex of factors," including (1) the economic

---

[88] *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018 (1992) (describing categorical takings as "the relatively rare situations where the government has deprived a landowner of all economically beneficial uses").

[89] *Lucas*, 505 U.S. at 1017 (A categorical taking occurs only in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted" (emphasis in original)); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (recognizing "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values.").

[90] *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (first quoting *Lucas*, 505 U.S. at 1015, then citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), *abrogated by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)).

[91] *Tahoe-Sierra Pres. Council*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017, 1019).

impact of the regulation on the landowner; (2) "the extent to which the regulation interferes with reasonable investment-backed expectations[;]" and (3) "the character of the government action[,]" commonly known as a *Penn Central* claim after *Penn Central Transportation Co. v. City of New York*.[92]

In the Superior Court and on appeal, Delmarsh made only one argument to support its takings claim—a *Lucas* claim that Delmarsh had been deprived of all economically beneficial use of the lots because, under the residential rezoning obtained while the appeal was pending, Delmarsh could not build single family homes on the lots. Delmarsh bore the burden of proving that DNREC's refusal to change the wetlands designation for the lots deprived the lots of any economically beneficial or productive use.[93]

Delmarsh's *Lucas* takings claim under the statute suffers from a fatal flaw. As the statute clearly provides, the taking is assessed at the time of DNREC's action—"the action appealed from constitutes a taking . . . ."[94] At the time DNREC turned down Delmarsh's request to de-designate the remainder of the lots as wetlands, the lots were zoned C/A: Conservation–Agriculture.[95] Instead of focusing

---

[92] *Palazzolo*, 533 U.S. at 617 (citing *Penn Central*, 438 U.S. at 124).
[93] *Lucas*, 505 U.S. 1003, 1016 n.6 (putting the burden on the landowner "to show that the Beachfront Management Act denied him economically beneficial use of his land.").
[94] 7 *Del. C.* § 6613.
[95] App. to Opening Br. at A-214–16. C/A zoning permits trails, storage, and agricultural uses, among other things. Zoning Ordinance, Town of Bowers, Kent County, Delaware, 34–35 (as amended Oct. 10, 2009), available at https://bowersbeach.delaware.gov/files/2014/03/ZONING _CODEb_Binder1.pdf.

on the economic impact of the de-designation on the lots as zoned at the time of DNREC's decision, Delmarsh relied exclusively on the economic impact on the lots as later rezoned to R-1—single-family residential housing. By its own admission, the rezoning to residential occurred after the denial of its DNREC application.[96] Delmarsh did not offer any argument or evidence that DNREC's refusal to redesignate the lots caused them to lose any value while they were zoned as C/A.[97] In the absence of such evidence, the Superior Court held correctly that no taking occurred.

## III.

We affirm the Superior Court's judgment.

---

[96] Opening Br. at 14; Reply Br. at 23–24.

[97] Certain activities are permitted under the Wetlands Act and Wetlands Regulations, if permitted by zoning law and the applicant can show that the activity "[r]equires water access or water for the central purpose of the activity; and [h]as no alternative on adjoining non-wetland property of the owner." 7 *Del. C.* § 6604; 7 Del. Reg. § 7502.7.1.4. Others are exempt from the permit requirement entirely, including certain agricultural uses that would be included under C/A zoning. 7 Del. Reg. § 7502.6.1.4.